Leon K. PERKINS, Defendant
Below, Appellant,

v.

STATE of Delaware, Plaintiff
Below, Appellee.

No. 126, 2006.

Supreme Court of Delaware.

Submitted: Jan. 17, 2007.
Decided: Feb. 26, 2007.

David J.J. Facciolo and Bradley V. Manning, Esquires, Office of the Public Defender, Wilmington, Delaware, for Appellant.

Timothy J. Donovan, Jr., Esquire, Deputy Attorney General, Department of Justice, Wilmington, Delaware, for Appellee.

Before BERGER, JACOBS and RIDGELY, Justices.

JACOBS, Justice.

Leon Perkins ("Perkins") appeals from final judgments of conviction, by a Superior Court jury, of First Degree Murder, Possession of a Firearm During the Commission of a Felony ("PFDCF") and two counts of Possession of a Deadly Weapon or Ammunition by a Person Prohibited ("PDWPP"). On appeal, Perkins claims that the Superior Court reversibly erred in four separate respects. We find no merit to these claims and, therefore, affirm.

## FACTS

On December 15, 2002 Wilmington police officers responded to a complaint that shots had been fired in or about Perkins' apartment. After arriving there, the officers discovered the dead body of a female victim lying at the bottom of the fire escape. Police identified the victim as Aunyea Hawkins ("Hawkins"), the mother of Perkins' daughter. Hawkins was found topless, wearing only a pair of medical scrubs. Nearby residents reported that they heard arguing, screaming, a "lot of heavy movement, footsteps ... enough to make the ... ceiling vibrate," and the sound of a single gunshot. Hawkins suffered a gunshot wound that traveled in a downward trajectory, entering the back of her head and exiting through the left side of her face.

Officers recovered a print of Perkins' thumb from a box of .38–caliber ammunition on the floor of his apartment. Perkins was later arrested and charged with Hawkins' murder. According to Perkins, the gun was thrown off a bridge into the Delaware River and never recovered.

At trial Perkins testified as follows: Hawkins had come to Perkins' apartment to pick up their daughter. There they engaged in sexual intercourse, after which Hawkins became sick and vomited on the living room floor. After Hawkins and Perkins took a shower together, Perkins started getting dressed to meet another woman. Hawkins scrolled through the caller ID log on Perkins' telephone. She became

enraged when she saw the telephone numbers of several women, and began screaming at Perkins. When Perkins entered from another room, Hawkins was pointing a gun at him. They struggled for control of the gun. Perkins eventually grabbed the gun from Hawkins, who began running down the fire escape. Perkins followed Hawkins while grasping the gun in his hand. When Perkins stopped to turn back towards the apartment, his hands went out to grab the railing, which caused the gun accidentally to fire into the back of Hawkins' head. Panicked, Perkins then fled the apartment and later threw the gun into the Delaware River.

Perkins was tried before a jury and found guilty of Murder First Degree, PFDCF, and two counts of PDWPP. He was sentenced to life imprisonment for the First Degree Murder conviction and a term of years for the other convictions.

Perkins appeals from those convictions and sentences, raising four claims of error. Specifically, Perkins claims that the Superior Court reversibly erred by (1) denying his motion for judgment of acquittal on the ground that the State failed to prove the victim's cause of death to a reasonable degree of medical certainty; (2) failing to issue curative instructions for improper prosecutorial remarks; (3) precluding the defense of self-defense to the charges of Murder in the First Degree and PFDCF, and limiting the defenses to those counts to the defense of accidental death; and (4) failing to instruct the jury on lesser included offenses, even though no request to do so was made. We turn to the issues generated by those claims.

## ANALYSIS

### I. *"Reasonable Medical Certainty" Claim*

Perkins' first claim on appeal is that, because the State failed to prove its case beyond a reasonable doubt, the trial court erroneously denied his motion for judgment of acquittal. Specifically, Perkins argues that the trial court should have granted his motion, because the medical examiner testified to a reasonable medical *probability* rather than to a reasonable degree of medical *certainty* that the gunshot wound was the cause of Hawkins' death. This Court reviews *de novo* a trial court's denial of a motion for judgment of acquittal. The test is whether any rational trier of fact, viewing the evidence in the light most favorable to the State, could find the defendant guilty beyond a reasonable doubt.[1]

In prior decisions this Court has found the terms "reasonable medical certainty" and "reasonable medical probability" to be legally interchangeable and indistinguishable. In *Dutton v. State*,[2] which also involved a first degree murder conviction, this Court addressed an argument identical to Perkins' and upheld the trial court's ruling that the "use of the words 'degree of medical probability,' . . . is sufficient under the circumstances. . . ."[3] In *Dutton* we stated:

> In homicide cases, where the cause of death is not susceptible of explanation based upon common observation or experience, qualified medical experts after proper and sufficient examination of the body or remains of the deceased may give opinion testimony based upon such examination "as to the *probable* cause of death, provided there are sufficient facts in evidence upon which to base the con-

---

**1.** *Priest v. State*, 879 A.2d 575, 577 (Del.2005), citing *Hardin v. State*, 844 A.2d 982, 989 (Del.2004).

**2.** 452 A.2d 127 (Del.1982).

**3.** *Id.* at 141.

clusion." [4]

In *Floray v. State*,[5] we cited *Dutton* for that principle, and held: "when an expert offers a medical opinion it should be stated in terms of 'a reasonable medical probability' *or* 'a reasonable medical certainty.' "[6] The United States Court of Appeals for the Third Circuit has also recognized that "[m]any courts have held that for all practicable purposes the two phrases [i.e. "reasonable medical certainty" and "reasonable medical probability"] are synonymous."[7]

In this case, Dr. Michael Caplan, the Assistant Medical Examiner, testified as to the cause and manner of Hawkins' death. He described the entrance and exit wounds of the single gunshot as well as the bullet's fatal trajectory, *i.e.*, entering through the left back side of the skull and brain and exiting through the right side of the nose.[8] Dr. Caplan concluded that Hawkins had been shot from behind with a downward trajectory path from an indeter-

minate range.[9] The prosecutor asked the witness if he was able "to determine the cause and manner of [Hawkins'] death to a reasonable medical probability." Dr. Caplan replied: "My conclusion was that the cause of death was a gunshot wound to the head with perforation of the skull and the brain and that the manner of death was homicide."[10]

Dr. Caplan's testimony conformed to the *Dutton* standard. Because "reasonable medical certainty" and "reasonable medical probability" are interchangeable terms, no error could result by eliciting medical expert testimony couched in either term.

■ Alternatively, Perkins contends that 29 *Del. C.* § 4707[11] required the medical examiner to testify to a reasonable degree of medical certainty in order for the State to prove its case beyond a reasonable doubt. That argument is unper-

---

4.  *Id. quoting* 40 Am.Jur.2d *Homicide* § 398 at 665 (1968).

5.  720 A.2d 1132 (Del.1998).

6.  *Id.* at 1136 (italics added).

7.  *Zerr v. Trenkle*, 454 F.2d 1103, 1106 (10th Cir.1972). *See also, Great Atl. & Pac. Tea Co. v. Hughes*, 53 Ohio App. 255, 4 N.E.2d 700, 705 (1935) (holding the term "reasonable certainty" was held not to mean "absolute certainty" but "reasonable probability," and the use in an instruction of the phrase "reasonable probability," instead of "reasonable certainty," was not error); and *Rogers v. Sullivan*, 410 S.W.2d 624, 628 (Ky.1966) (holding "a qualified opinion based on reasonable probability satisfies the requirement usually expressed as 'reasonable certainty' ").

8.  App. to Appellant's Opening Br. at 126.

9.  App. to Appellant's Opening Br. at 126–28.

10.  App. to Appellant's Opening Br. at 127.

11.  29 *Del. C.* § 4707 states, in pertinent part that:

*Postmortem examination; autopsy reports.*

(a) When the cause of death shall have been established within reasonable medical certainty by a Medical Examiner, the Medical Examiner shall prepare a written report and file it in the office of the Chief Medical Examiner within 30 days after an investigation of such death

(b) If, however, in the opinion of the Medical Examiner an autopsy is necessary in the public interest or as shall be requested by the Attorney General, the same shall be performed by the Chief Medical Examiner, an Assistant Medical Examiner or by such other competent pathologists as may be designated by the Chief Medical Examiner. No person who authorizes or performs an autopsy pursuant to this chapter shall be liable in any civil action for damages.

(c) A detailed report of the findings written during the progress of the autopsy, related laboratory analysis and the conclusions drawn therefrom shall be filed in the office of the Chief Medical Examiner.

29.  *Del. C.* § 4707 (2003).

suasive. 29 *Del. C.* § 4707, which is titled "Postmortem examination; autopsy reports," does not impose any such requirement with respect to a medical examiner's in-court testimony, nor has this Court so held. No part of the statute purports to establish a standard for a medical examiner's in court testimony concerning the cause of death. Testimony "as to the *'probable* cause of death' has been explicitly established as the standard for medical examiners in Delaware, but 'certainty' has never been required." [12] For these reasons, Perkins' first claim fails.

## II. *The Curative Jury Instruction Claim*

■ Perkins next claims that the Superior Court erred by not issuing, *sua sponte,* a jury instruction to cure the prejudice resulting allegedly from the prosecutor's remarks to the jury. The prosecutor argued:

> What else does [Perkins] say about that night? He says the sex—he had sex and then casually took a shower, you know, one of those loving showers with Aunyea, the two of them, very touching. Does that make sense when you know somebody else is coming shortly? Does that make sense before Jessica is coming over that he's casually taking his shower, getting out and getting himself all dressed up?
>
> Doesn't make sense, because when [Perkins] ran out the door that night after he shot and killed Aunyea, [Perkins'] pulling his pants up. There hadn't been any lovey-dovey in the shower with Aunyea.

This all happened—it all happened in a very short period of time. It didn't happen after a shower and everybody getting cleaned up.

No. He was not in love that night. He had sex that night and *something went bad.* Aunyea, the State suggests, wasn't smiling and bringing him on that night. *He made her sick, she threw up and somehow when she did that, he was enraged.*[13] (Emphasis added).

Perkins' counsel did not object to these remarks during the trial.

■■ Perkins argues that because the issue of rape had been ruled out of the case during *in limine* proceedings, the prosecutor improperly re-injected that issue during his closing argument remarks, which implied that Perkins had raped Hawkins.[14] This Court reviews *de novo* properly raised claims of impermissible prosecutorial remarks.[15] But where, as here, the prosecutorial remarks are not objected to at trial, this Court will review for plain error,[16] which warrants reversal only if the remarks were "so clearly prejudicial to substantial rights as to jeopardize the fairness and integrity of the trial." [17]

In this case the prosecutor's remarks, when viewed in context, created an inference that was proper given the evidence,[18] namely, that Hawkins vomited after having sexual intercourse with Perkins. Perkins testified that he and Hawkins had sex, they then had an altercation, and that Hawkins was "ready to snap" and "up real

---

12. *Id.* (italics added).

13. App. to Appellant's Opening Br. at 275–76.

14. Appellant's Opening Brief at 24–26.

15. *Daniels v. State,* 859 A.2d 1008, 1011 (Del. 2004).

16. *Wainwright v. State,* 504 A.2d 1096, 1100 (Del.1986).

17. *Robertson v. State,* 596 A.2d 1345, 1356 (Del.1991).

18. *Id.*

close in [his] face" screaming.[19] In his closing argument the prosecutor suggested that the tone of the couple's · interaction changed drastically when "something went bad," ultimately leading to the victim being shot in the back of the head. This inference, which the prosecutor asked the jury to draw, flowed legitimately from the evidence.

Perkins has failed to identify any substantial right that was jeopardized by the prosecutor's remarks. Perkins himself testified that the victim vomited after having sexual intercourse with him. Because the prosecutor's remarks did not create an unfair inference or compromise the fairness of Perkins' trial, the failure to issue a *sua sponte* curative instruction was not error, let alone plain error, that would warrant reversal.

■ Perkins also challenges the trial court's failure to issue a separate curative instruction in response to a separate trial event. The prosecutor asked the defense's expert witness why she failed to test the hair sample for gunshot residue.[20] That question, Perkins claims, improperly suggested that the defense had the burden of proof. We disagree, because the jury was told that the State had the burden of proof. In response to an earlier prosecutorial question, the trial court gave a curative instruction to the jury that the burden of proof rested with the State.[21] Moreover, immediately before the prosecutor asked the arguably improper question, the trial court again instructed the jury that "at all times the burden is on the State to prove beyond a reasonable doubt.... It always remains on the State."[22]

We conclude that the trial court committed no error, let alone plain error, by not issuing the curative instructions that Perkins claims was legally required.

### III. *The "Justification" and "Accident" Defenses*

Perkins' third claim is that the Superior Court erred by failing to instruct the jury on the defenses of "accident" and self-defense with respect to all counts of the indictment. At trial, the Superior Court gave an accident defense instruction only as to the first two counts, Murder First Degree and PFDCF. In contrast, the Superior Court gave "choice of evils" and "justification" (self-defense) instructions as to the charge of Possession of a Deadly Weapon by a Person Prohibited, but not as to the fourth count, which charged Perkins

---

19. App. to Appellant's Opening Br. at 224.

20. This question occurred during the recross-examination of Dr. Elzbieta Bakowska, Perkins' expert witness relating to gunshot residue testing:

> Q: One of the things that you received in the packet of evidence that you received was a hair sample from Aunyea Hawkins; is that correct?
> A: Yes.
> Q: Did you test that hair sample?
> A: No, it was specified not to be tested for gunshot residue.
> Q: Do you know why?
> A: No, we don't question the why from the clients.

App. to Appellant's Opening Br. at 164.

21. After the prosecution's redirect examination of Detective Conner asking: "Detective Conner, did the defense counsel ever ask for a photograph?", defense counsel objected. The trial court sustained the objection and gave a curative direction as follows:

> Ladies and gentlemen, you are to disregard in its entirety the last question. I sustained the objection to it. The defense bears no burden of proof in this case. At no time does the defense have the burden of proof. It is always the State's burden of proof to prove the defendant's guilt beyond a reasonable doubt. To the extent the question suggests that the defense had an obligation to do anything is contrary to the law.

22. App. to Appellant's Opening Br. at 147.

with Possession of Ammunition by a Person Prohibited.

■ "This Court reviews *de novo* the Superior Court's denial of a requested jury instruction."[23] The test is whether the jury instruction "correctly states the law and is not so confusing or inaccurate as to undermine the jury's ability to reach a verdict."[24] "A trial court's jury instruction is not a ground for reversal if it is reasonably informative and not misleading, judged by common practices and standards of verbal communication."[25]

■ The Superior Court correctly denied Perkins' request for a self-defense instruction with respect to the charges of First Degree Murder and PFDCF. As we have noted, "a defendant is entitled to a jury instruction on self-defense only if there is evidence sufficient to establish each element of that defense."[26]

Under 11 *Del. C.* § 464(c), deadly force is justifiable "if the defendant believes that such force is necessary to protect the defendant against death, serious physical injury, kidnapping or sexual intercourse compelled by force or threat."[27] But, to be entitled to an instruction on self-defense the defendant must present "some credible evidence supporting [the] defense...."[28] "[T]he evidence presented by a defendant seeking a self-defense instruction will be deemed 'credible' for purposes of 11 *Del. C.* § 303(a) where the defendant's rendition of events, *if taken as true*, would entitle him to the instruction."[29]

Here, even if Perkins' rendition of the events were taken as true, the evidence would not support a defense of self-defense. At trial, Perkins testified that: (1) once he was in control of the gun he thought Hawkins would just run away; (2) once he broke loose from Hawkins, he (Perkins) tried to run away; and (3) the gun went off accidentally. Perkins never testified that he believed his own life was in danger or that he needed to defend himself by using deadly force. Given the absence of evidentiary support required for a self-defense instruction, the Superior Court did not err in denying Perkins' request for that instruction.

■ The Superior Court also properly denied Perkins' request for an "accident" defense instruction with respect to the charge of PDWPP. Even taking Perkins' account of the events as true, the evidence showed that Perkins *purposely* took the gun out of Hawkins' possession while defending himself. The evidence was, therefore, insufficient to support an accident instruction on the possession of a deadly weapon charge.

■ Finally, the Superior Court properly denied Perkins' request for self-defense and accident instructions on the charge of Possession of Ammunition by a Person Prohibited. The evidence consists of police testimony that a box of .38 caliber ammunition was found in Perkins' apartment, and that Perkins' fingerprint was found on that box of ammunition.[30] No

**23.** *Gutierrez v. State,* 842 A.2d 650, 651 (Del. 2004), *citing Lunnon v. State,* 710 A.2d 197, 199 (Del.1998).

**24.** *Cabrera v. State,* 747 A.2d 543 (Del.2000).

**25.** *Floray v. State,* 720 A.2d 1132, 1137 (Del. 1998).

**26.** *Fetters v. State,* 436 A.2d 796, 797 (Del. 1981).

**27.** 11 *Del. C.* § 464 (2001).

**28.** 11 *Del. C.* § 303(c) (2001).

**29.** *Gutierrez v. State,* 842 A.2d 650, 651 (Del. 2004) (italics added).

**30.** Officer Joseph Sammons testified that: "My finding was that on a 3–by–5 print card which was labeled Top Of and it quotes 'UMC cartridge box,' identified one fingerprint as

reasonable view of that evidence supported an instruction on an accident or a justification defense. Accordingly, we find no merit in Perkins' third claim of error.

### IV. *The Lesser Included Offenses Jury Instruction Claim*

▮▮▮ Despite his failure to request—and having expressly rejected—such an instruction, Perkins claims that the trial court's failure to instruct the jury on lesser included offenses violated his Due Process rights. Where a defendant fails to request a lesser included offense jury instruction at trial, we "review that claim for plain error, which requires a showing that the failure to grant that instruction would have affected the outcome of his trial." [31]

Perkins first argues that the Superior Court's failure to instruct the jury on lesser included offenses "may have pressured the members of a jury to unfairly balance a lifetime sentence with immediate acquittal." [32] We disagree. Delaware applies the "party autonomy" doctrine under which "the burden of requesting lesser-included offense instructions is properly placed upon trial counsel, 'for it is they who determine trial tactics and presumably act in accordance with a formulated strategy.' " [33] In *State v. Cox*, we declared that "the trial court ordinarily should not give a jury instruction on an uncharged lesser included offense where neither side requests or affirmatively agrees to such instruction." [34] The burden falls on defense counsel to request the instruction; otherwise, the trial court cannot "discount the possibility that such a position [to decline the instruction] is a tactical decision by defense counsel." [35] Here, Perkins' counsel failed to request instructions on lesser included offenses of First Degree Murder. Despite that, the trial court conducted an independent colloquy with Perkins regarding his decision not to seek instructions on lesser included offenses. It is clear from that colloquy that Perkins knowingly, voluntarily and willingly waived his opportunity to have the trial court instruct the jury on lesser included offenses.[36]

▮▮▮ Alternatively, Perkins claims that the "party autonomy" rule violated his con-

---

the left thumb of Mr. Perkins." App. to Appellant's Opening Br. at 117.

**31.** *Keyser v. State*, 893 A.2d 956, 960 (Del. 2006).

**32.** Appellant's Opening Brief at 32.

**33.** *State v. Cox*, 851 A.2d 1269, 1274 (Del. 2003), *quoting Chao v. State*, 604 A.2d 1351, 1358 (Del.1992).

**34.** *Cox*, 851 A.2d at 1273, *quoting Hagans v. State*, 316 Md. 429, 559 A.2d 792, 804 (1989).

**35.** *Keyser*, 893 A.2d at 961.

**36.** During the prayer conference, the following colloquy occurred between the trial court and defense counsel:

> The Court: I received the case law in lesser includeds. If State is not asking for lesser includeds—if the defendant is not asking for lesser includeds and the State is taking no position, then the Court is not going to give lesser includeds.
> [Defense Counsel:] Your Honor, we do not want lesser includeds. We've discussed this thoroughly with my client. While I am of the philosophical bent that truth process requires the ability to shade areas of gray from areas of black and white, we have decided in discussions with our client to ask only for murder first or not guilty.
> The Court: And your client understands that given the record as we know it, there is a rational basis for lesser includeds.
> [Defense counsel:] Yes, in fact, my client does understand that. . . . I have already indicated on the record with my client's consent, without any hesitancy, that it is our decision to ask for only murder first or not guilty.

App. to Appellant's Opening Br. at 256.

stitutional rights. Relying on the United States Supreme Court decisions in *Schad v. Arizona*[37] and *Hopper v. Evans*,[38] Perkins claims his Due Process rights were violated when the jury was confronted with an all-or-nothing choice, in this case to convict of First Degree Murder or acquit. Both of those decisions recognize that Due Process concerns can arise when a jury is forced to decide between capital murder and innocence, but in those cases the concern arose because a state statute precluded the jury from being instructed on lesser included offenses. Delaware has no such statute, and neither decision holds that Due Process concerns arise from a trial judge's failure to instruct the jury *sua sponte*.

In *Beck v. Alabama*,[39] a case cited in both *Schad* and *Hopper*, the United States Supreme Court indicated that there is no affirmative duty for the judge or prosecution to instruct on lesser included offenses.[40] As the United States Court of Appeals for the Ninth Circuit has observed, "the U.S. Supreme Court has held that instructions upon lesser included offenses were not compelled by Supreme Court precedent." [41]

We determine that a defendant is entitled to an instruction on lesser included offenses if he or she requests the instruction and evidence in the record supports it.[42] In this case, Perkins' Due Process rights were not violated because he himself rejected a lesser included offense instruction that would otherwise have been given.[43]

Because the instructions as to lesser included offenses were rejected by Perkins himself and the Superior Court had no affirmative duty to so instruct the jury *sua sponte*, no violation of Perkins' Due Process rights occurred.

## CONCLUSION

For the foregoing reasons, the judgments of the Superior Court are affirmed.

---

**37.** 501 U.S. 624, 111 S.Ct. 2491, 115 L.Ed.2d 555 (1991).

**38.** 456 U.S. 605, 102 S.Ct. 2049, 72 L.Ed.2d 367 (1982).

**39.** 447 U.S. 625, 100 S.Ct. 2382, 65 L.Ed.2d 392 (1980).

**40.** *Id.* at 637–38, 100 S.Ct. 2382.

**41.** *Blakeley v. Terhune*, 126 Fed.Appx. 396, 398 (9th Cir.2005).

**42.** *Id.*

**43.** Perkins claims that the colloquy between the trial court and himself was defective because the court should have asked more detailed questions, as was done in *Brown v. State*, 250 A.2d 503 (Del.1969). *Brown* is distinguishable from this case. *Brown* involved a suggested line of questioning where a defendant offers a guilty plea. Perkins offers no support for imposing a similar standard where the court questions a defendant on his decision to forgo an instruction on lesser included offenses.