Anne DUNLAP, Deborah Dunlap and
James Dunlap, Plaintiffs

v.

STATE FARM FIRE AND CASUALTY
COMPANY, Defendants.

Civil Action No. 03C–12–168–JOH.

Superior Court of Delaware,
New Castle County.

Submitted: June 11, 2007.
Decided: Aug. 3, 2007.
Opinion of Aug. 3, 2007—VACATED.
Revised: May 8, 2008.

James J. Woods, Esquire, of Wilmington, Delaware, attorney for plaintiffs.

Daniel V. Folt, Esquire, of Duane Morris, LLP, Wilmington, Delaware, attorney for defendant.

### OPINION

HERLIHY, J.

The Court has before it myriad motions in a case that has a complex history which has deteriorated into a troubling lack of civility.

The motions are:

1. Defendant State Farm's motion for summary judgment.

2. Plaintiff Anne Dunlap, Deborah Dunlap, and James Dunlap's cross motion for summary judgment.

3. Defendant State Farm's motion to preclude the deposition or testimony of Francis J. Jones, Esquire or to compel him to produce certain documents if he does have to testify.

4. Plaintiffs Dunlaps' motion *in limine* to bar the testimony of Dr. Alan Fink.

5. Defendant State Farm's motions to disqualify plaintiff's counsel.

### Procedural/Factual History

To appreciate the current quagmire, it is necessary to start with the precipitating event.

On August 7, 1998, plaintiff Anne Dunlap was a passenger in a car driven by her then boyfriend, Marc Cardillo. She was at that time a minor. Cardillo made an abrupt left turn in front of a DART bus which hit Cardillo's car on the side on which she was riding. Anne Dunlap was seriously and permanently injured. She is partially paralyzed for life and suffered a severe brain injury. Her medical and other expenses are far in excess of one million dollars.

There were, therefore, two potential tort-feasors, Cardillo and DART. Cardillo's carrier ultimately paid policy limits to the Dunlaps. The other potential tortfeasor, DART, had a $300,000 cap on its liability.[1] The Dunlaps also had a one million dollar underinsurance motorist (UIM) policy with defendant State Farm. Delaware law provides that the UIM carrier is not liable until the primary coverage (here Cardillo and DART) has first been exhausted by judgments or settlements.[2]

To potentially trigger State Farm's UIM coverage, the Dunlaps sued DART (and

1. 2 *Del. C.* § 1329(b).

2. 18 Del. C. § 3902.

the bus driver). The case went to trial in September 2002, over which this judge presided, and resulted in a verdict of no liability by DART. The Dunlaps' post-trial motion was denied.[3] There was no appeal.

The law suit against DART had been filed in August, 2000. The Dunlaps had been negotiating with DART for a period of time prior to the trial. DART always contested liability; nevertheless in September 2001, it and the Dunlaps reached a tentative settlement for $175,000. The Dunlaps sought State Farm's consent to settle because of the $125,000 gap in the offer and DART's maximum liability. Also, they sought State Farm's blessing since the offer would not have met the statutory exhaustion requirement. On December 18, 2001, State Farm rejected the proposition:

State Farm has asked me to take a look at this case and to respond to your request to permit a settlement between the plaintiff and DART for less than DART's policy limits. It is my understanding that you want State Farm's approval to accept less than the available limits and to then pursue an underinsured motorist claim against State Farm. State Farm declines to extend that approval

We've done some research on the issue. We're satisfied that pursuant to the applicable policy, 18 Del. C. § 3902(b)(3) & (4) and *Eskridge v. National Gen. Ins. Co.*, Del.Super., [1997] WL 127959, Graves, J. (February 8, 1997), that the insured must exhaust all applicable motor vehicle policies of the tortfeasors before pursuing underinsured motorist coverage from the insured's own policy. The plaintiff's complaint alleges that both Cardillo and DART were negligent

in a manner proximately causing injury to Ms. Dunlap. I understand that Cardillo has tendered his policy limits and that DART has tendered $175,000 of its $300,000 policy limits. It seems to me that with the claims of the plaintiff that both entities caused her injuries and an acknowledgment on her behalf of both that they did play a part in causing the accident which caused her injuries that both are tortfeasors as the law and the policy contemplate.

If you have Delaware law to the contrary would you please send it to me? I'm not aware that there is any authority in this state for the proposition that you've asked State Farm to accept.[4]

This rejection meant the suit against DART had to proceed to trial. If DART were found negligent in even the smallest percentage, its $300,000 coverage would have been triggered. As it was, the judgment in its favor meant the only remaining primary insurance coverage had been "exhausted" by that judgment.

As a consequence and subsequently, State Farm paid to the Dunlaps the one million in UIM coverage. That payment, however, did not provide or account for all of Anne Dunlap's medical bills and expenses. Prior to its payment, State Farm had an IME performed which confirmed Anne Dunlap's severe and permanent injuries. But, because even this million dollar payment failed to cover her expenses and bills, the Dunlaps sued State Farm in December, 2003. They sought the $175,000 and other compensation. The basis of their suit was that State Farm had acted in bad faith in refusing to consent to the proposed $175,000 settlement with DART.

When that suit was filed, this judge was Criminal Administrative Judge full-time

---

**3.** *Dunlap v. State Farm Fire and Casualty Co.,* 2004 WL 1427001 (Del.Super.2004).

**4.** Plaintiffs' Answering Brief, Exhibit T.

and no new incoming civil cases were assigned to him and his pending civil caseload had been transferred to another judge. A different judge, therefore, was assigned to handle the Dunlaps' suit against State Farm.

State Farm moved to dismiss that bad faith suit. It was denied.[5] On appeal, that decision was affirmed in part, and reversed and remanded in part. The part that was affirmed, however, was that the Dunlaps' claim did not state a cause of action for bad faith. The reversal and remand was to allow the Dunlaps to make, if they could, a claim that State Farm had breached the covenant of good faith and fair dealing implied in their insurance contract.[6]

After remand, the Dunlaps filed an amended complaint alleging State Farm had breached the implied covenant of good faith and fair dealing. State Farm moved to dismiss the amended complaint. That motion was denied in a bench ruling. Some discovery was undertaken or scheduled. The assigned judge held a scheduling conference on May 1, 2006 at which a series of deadlines were worked out and a scheduling ordered entered.[7]

But events occurred at that scheduling conference which have substantially muddied the waters of this case. They also form a basis for State Farm's motion to disqualify the Dunlaps' counsel, Jim Woods. He has represented them since shortly after the 1998 accident up to this time.

One of the events was an apparent *ex parte* comment made Woods to the assigned judge after that office conference. The other event was after that office conference, he wrote to the assigned judge asking for recusal. Shortly thereafter, the assigned judge *sua sponte* entered a recusal.

After the recusal order, this judge was assigned to the case. State Farm, thereafter, filed several motions to have Woods disqualified and a motion to compel discovery. The latter motion was granted in part and denied in part. The disqualification motions were denied without prejudice.

Thereafter, discovery relating to the amended complaint was undertaken, including the deposition of James Woods. That discovery has revealed extensive records of internal State Farm communications and communications between State Farm and Woods. It has also included a deposition of Anne Dunlap's father.

The record now presented to the Court after that discovery in State Farm's motion for summary judgment and the Dunlaps' cross motion for summary judgment can be summarized, for purposes of the opinion:

1.  In September, 1998, State Farm noted that Anne Dunlap had a "severe brain injury."[8]

2.  State Farm assigned the Dunlap matter to adjuster Maude Niedzielski in late 1999 or early 2000. She wrote Woods on January 27, 2000 asking him to send her (a) all medical records for Anne Dunlap and (b) have a parent sign a medical release to enable State Farm to obtain the records.

3.  State Farm put a $500,000 reserve

5.  *Dunlap v. State Farm Fire and Cas. Co.,* 2004 WL 1427001 (Del.Super.).

6.  *Dunlap v. State Farm Fire and Cas. Co.,* 878 A.2d 434 (Del.2005).

7.  Docket entry number 30.

8.  Plaintiffs' Answering Brief, Exhibit A.

aside in February, 2000.[9]

4. Niedzielski wrote Woods in June 2000 indicating (a) State Farm still had no records, (b) asking again for the medical records, and (c) that a new medical authorization (release) form was enclosed. She noted that Woods was "not interested" in having a parent sign the form.[10] In his deposition, Woods said it was not his policy to provide authorization to insurers until after suit was filed.[11] In her deposition, Niedzielski testified she had never encountered this position from any other attorney.[12]

5. On December 20, 2000, Niedzielski acknowledged receipt of all medical records through October, 2000. She noted that the records (a) spoke of "moderate/severe" brain injury and (b) some improvement in memory.[13]

6. Niedzielski wrote Woods on January 2, 2001. She mistakenly noted (as best the Court can determine; see paragraph 9, *infra* p. 9) that the records received to date were through February, not October 2000. She on to write:

> We are enclosing another Medical Authorization in hopes that you will have your client sign this, so that we may assist you in obtaining the medical records associated with her injuries
>
> We need to obtain these updated records in order to prepare a complete evaluation of our insured's claim. In particular, we need to know what progress she is making and her doctors' prognoses.
>
> We anticipate your cooperation and hope that we can bring this matter to resolution as soon as possible.[14]

7. On March 23, 2001, Niedzielski called Woods to get updated medical records. He called back later that day to indicate he would send them.[15]

8. There is an internal note by Niedzielski of March 29, 2001, that suggests a "value" of the case of between $500,000 and one million (policy limits).[16]

9. Niedzielski wrote Woods again on July 27, 2001 asking for medical records since February, 2000. She told Woods that because of Anne's severe injuries, she wanted to keep her file current.[17]

10. Her letter crossed with one from Woods dated July 25, 2001. Woods indicated Anne Dunlap was still being treated. He asked if State Farm were going to pay that one million.[18]

11. In a letter dated September 18, 2001, Woods wrote Niedzielski.[19] He informed her that, despite the fact DART did not believe it was negligent, it was willing to settle. DART's $300,000 limit was mentioned; Woods said the possible settlement would be less. He also said Nationwide, the carrier for the Cardillo car Anne Dunlap was in, had paid $500,000.

---

9. Plaintiffs' Answering Brief, Exhibit E.

10. *Id.*, Exhibit D.

11. Woods deposition p. 162.

12. Niedzielski deposition, p 166.

13. Defendant's Brief, Exhibit G.

14. Defendant's Brief, Exhibit H.

15. Defendant's Brief, Exhibit I.

16. Plaintiffs' Answering Brief, Exhibit H.

17. Defendant's Brief, Exhibit J.

18. Defendant's Brief, Exhibit K.

19. Defendant's Brief, Exhibit L.

12. State Farm sought the assistance of Colin Shalk, Esquire, who does a lot of defense work, to review and opine about the exhaustion issue prompted by the possible DART settlement of below $300,000. Woods wrote Shalk about it on November 13, 2001.[20]

13. In that same letter, Woods enclosed a report from Dr. James Crowley, a psychologist at A.I. DuPont Hospital. Dr. Crowley describes Anne Dunlap's condition, her treatment and itemized treatment needs with costs[21] of somewhere around $1,000,000 and $2,700,000. It appears Woods did not send Dr. Crowley's report to any adjuster at State Farm.

14. An associate of Shalk's researched the issue of exhaustion. In a memo to Shalk he initially described Anne Dunlap's injuries as "catastrophic" which Shalk had him remove before it was sent onto State Farm.[22] The associate noted that the arbitration in the Dunlap suit against DART had found in DART's favor.

15. Shalk wrote Woods on December 18, 2001, asking him to supply authority to support "exhaustion" when DART would settle for under its $300,000 limit.[23] Woods did not supply authority. Most importantly, in his letter, Shalk also stated, "It is my understanding that you want State Farm's approval to accept less than the available limits [of DART] and to then pursue an underinsured motorist claim against State Farm. State Farm declines to extend that approval."[24]

16. On January 23, 2002, Shalk wrote Niedzielski. He discussed his conversation with the attorneys representing DART in the Dunlap suit. Pertinent portions of the letter state:

> I did take a look at the file for this letter. I wrote to Jim Woods on December 18, declining to let him accept less than the DART policy limits and to still pursue an underinsured motorist arbitration against State Farm. I did offer him the opportunity at the conclusion of the letter to provide Delaware law to the contrary and I've heard nothing from him. I'm assuming from this that he hasn't found any law to the contrary. This is the kind of thing that you would have researched before you made the demand upon the carrier and if he had the case law he would most likely have provided it earlier.
>
> Following the start of this letter I called and spoke to both Pete Jones and Jim Drnec of the Morris James law firm. I spoke to Pete about the case for about 20 minutes and he told me that he turned over the file to Drnec. I discussed some of the strategic issues with Pete and then I discussed some of the factual issues with Jim.
>
> Pete thinks that we're wrong in not permitting the plaintiff to accept part of the DART monies and to pursue the underinsured claim against State Farm. He's clearly not aware of any case law contrary to State Farm's position he just thinks that at "the end of the day" State Farm will end up paying its full policy limits to the insured. He

---

**20.** Plaintiffs' Answering Brief, Exhibit J.

**21.** Plaintiffs' Answering Brief, Exhibit K.

**22.** Plaintiffs' Answering Brief, Exhibit M.

**23.** Plaintiffs' Answering Brief, Exhibit T.

**24.** *Id.*

said that our position may end costing the insured $175,000. Of course if DART is in fact a tortfeasor then the plaintiff's position may end up benefitting her by $300,00 more than she would have received had she not sued DART in the first place.

Pete and I discussed this case back and forth for about 20 minutes and we simply agreed to disagree at the end. I asked him what position he would take a few years from now if State Farm did what Jim Woods wanted it to do now and a few years from now he had a similar fact pattern. If State Farm declined to do the same thing in the future would he remind State Farm of what it did in the Dunlap case and he said that he would. He said that the ultimate value of the case may be different in the future case. I told Pete that if State Farm changed its interpretation of its own policy language from case to case depending upon the exposure to it that this would be bad faith. Relying upon strict interpretation of its own policy and what it believes to be Delaware law can hardly be bad faith.

He asked what position State Farm would take if Woods dismissed DART and he asked that as a rhetorical question. He quickly told me that State Farm would clearly take the position that DART was a tortfeasor and that it had to have exhausted the DART limits before it could pursue State Farm. While he asked and answered his own question that does raise a good point.

To this point the plaintiff is taking two conflicting points of view and trying to meld them into one consistent story. That is, she's taking the position that DART is a tortfeasor for the purposes of the lawsuit and the offer but she's also taking the position that DART is not a tortfeasor for the purposes of exhausting the policy limits of the tortfeasors. If the plaintiff had simply chosen not to sue DART in the first place it's unlikely that State Farm would have insisted that the DART limits be exhausted before the underinsured coverage could be approached. The question is whether there's anything that can be done to undo what has occurred up to this point or at least to put some responsibility upon the plaintiff to make a choice.

As I've said on prior occasions I don't know much about the plaintiff's injuries. I know that you think that they are significant and Pete Jones said much the same thing during our conversation. He made it clear to me that he believes that no matter how the suit against DART turns out that State Farm will be paying its policy limits. I don't know if State Farm shares that belief or whether its even assessed the monetary value of plaintiff's injuries.

I've not made any qualitative judgments about DART's liability except to state that it appears to be thin. I offer that opinion without actually having read any of the discovery in the *Dunlap v. Cardillo* and DART case. If State Farm has any interest in permitting the plaintiff to dismiss DART as a defendant in the Cardillo case and without the payment of any of the DART money then I'd be happy to review the discovery to see if there's any reasonable possibility of the DART de-

fendant being held liable for negligence.

As I can see the case the problem arises from the plaintiff's choice of strategy and not State Farm's reliance upon its policy language and Delaware law. If after a thorough investigation of the facts the plaintiff concludes that DART was not responsible for the accident notwithstanding the offer and if the plaintiff chooses to dismiss DART from the lawsuit will State Farm agree that it won't raise the lawsuit against DART and the offer as a defense to the underinsured motorist claim? If the plaintiff truly believes at this point that DART is not an appropriate defendant and that it is not a tortfeasor and the plaintiff chooses to dismiss the DART and if State Farm won't raise that as an issue then the plaintiff can pursue the underinsured motorist claim against State Farm.

Offering the plaintiff the choice seems to me be consistent with State Farm's policy. That is, if she's going to take the position that DART is a tortfeasor then the plaintiff must exhaust those limits before pursuing the underinsured motorist claim. If the plaintiff is going to take the position that DART is not a tortfeasor and State Farm is willing to honor that position then she can proceed directly to pursue the underinsured motorist limits. If we offer the plaintiff a choice then she can either continue to pursue DART in the hope that she gets the full $300,000 policy limits or dismiss DART from the case now and receive a prompt underinsured motorist arbitration.

From my point of view giving the plaintiff a choice has the benefit of returning the problem to the place where it started. If the plaintiff chooses to continue to pursue DART then she has made the choice that the additional $300,000 is important enough to her to pursue it. If she chooses not pursue DART then it seems to me that she should have the right to the underinsured claim against State Farm.[25]

17. In an internal memo dated January 28, 2002, Paul Bell of State Farm noted:

I have placed a call to Colin Shalk to discuss his 1/23/02 letter. I believe we should have Colin take a look at the discovery including any recon reports that N/W presents. If there is negligence on DART based on discovery then we will not agree to their dismissal from the case. If there is no negligence on DART and the plaintiff agrees to dismiss them then we would handle the UIM claim upon receipt of all relevant medical documentation, that we have been asking for but have still not received from plaintiff. Next report due 3/28/02.[26]

18. State Farm had repeatedly sought from Woods Anne Dunlap's medical records. Somehow, Shalk and his associate became aware of a "large file" of medical records; apparently in the custody of DART's attorneys.[27] That "pile" of records was mentioned in Shalk's April 16, 2002, letter to Niedzielski along with a reference to Dr. Crowley's report Woods had sent to

---

**25.** Plaintiffs' Answering Brief, Exhibit U.

**26.** Plaintiffs' Answering Brief, Exhibit V.

**27.** Plaintiffs' Answering Brief, Exhibit X.

Shalk. At this time, it appears State Farm's representatives expressed no interest in the "pile" of records or sought a copy of that report.

19. After the verdict in the DART part of this matter, Woods supplied additional records to State Farm. From discovery it has later learned Anne Dunlap's father had withheld certain records from State Farm expecting it to rely on summaries of her condition. The supplied medical records did not include a prognosis.[28]

20. State Farm first sought to get a "records review" IME, especially to get a prognosis. A live IME was performed and the doctor's report prompted State Farm to pay its $1,000,000 UIM coverage.

The parties' motions for summary judgment do not entirely overlap, and the Dunlaps' motion, in effect, seeks to re-litigate an issue already adjudicated. A part of their motion asks this Court to determine that the undisputed facts demonstrate State Farm's actions meant it breached the implied covenant of good faith and fair dealing. As State Farm's summary judgment motions seeks a determination that it did not do so, the motions overlap.

But the Dunlaps also argue that, with the breach established, the issues in the case are compensatory and punitive damages. Their motion does not stop there. They also seek entry of an order that State Farm has litigated in bad faith and misled this Court and the Supreme Court on material matters. Accordingly, they ask the Court to "fine" State Farm and award counsel fees.

The Court will first address the cross motions for summary judgment.

## I

## A

### Applicable Standards

The standards for reviewing motions for summary judgment are well-known. But they bear repeating, especially since there are cross-motions for summary judgment. A motion for summary judgment may only be granted where there are no genuine issues of material fact and the moving party is entitled to judgment as a matter of law.[29] The record must be reviewed in a light most favorable to the non-moving party.[30] When, however, there are cross-motions for summary judgment, that does not mean there are not genuine issues of material fact.[31] Where the parties file cross-motions for summary judgment, neither side's will be granted unless there are no genuine issues of material fact and one party is entitled to judgment as a matter of law.[32] Therefore, with such cross-motions, the Court must determine if there are genuine issues of material fact presented.[33]

### Discussion

The parties' cross motions pose, in effect, four basic questions:

1. Are there or are there not genuine issues of material fact concerning whether State Farm did *not* commit a

28. Defendant's Brief, Exhibit S.

29. *Brzoska v. Olson*, 668 A.2d 1355, 1364 (Del.1995).

30. *Alabi v. DHL Airways, Inc.*, 583 A.2d 1358, 1361 (Del.Super.1990).

31. *Mason v. United Services Auto. Ass'n*, 697 A.2d 388, 392 (Del.1997).

32. *Emmons v. Hartford Underwriters Ins. Co.*, 697 A.2d 742, 745 (Del.1997).

33. *State ex rel. Mitchell v. Wolcott*, 83 A.2d 759, 762 (Del.1951).

breach of the covenant of good faith and fair dealing?

2. If there are no such factual issues, is State Farm entitled to judgment as a matter of law?

3. Are there or are there not genuine issues of material fact concerning whether State Farm *did* breach the covenant of good faith and fair dealing?

4. If there are no such factual issues, are the Dunlaps entitled to judgment as a matter of law?

Each side, of course, contends that there are no genuine issues of material fact and that the undisputed record shows it is entitled to summary judgment. As *Emmons*[34] says, unless there are no such genuine issues in a case of cross motions, neither side is entitled to summary judgment.

■ In January, 2006, the previously assigned judge denied State Farm's motion to dismiss. Much discovery has been undertaken since then, although the exchange of letters between counsel (Woods and Shalk) were obviously known when this Court dismissed the Dunlaps' bad faith claim. The expanded record demonstrates far more was communicated between Woods, State Farm representatives, and State Farm's counsel on the issue of medical records and the DART matter. The record now shows more of the thinking of Mr. Dunlap and Woods on that issue.

The Dunlaps, however, have raised a threshold issue seeking to address the content of the expanded record. When their claim of State Farm's bad faith was dismissed here and that was affirmed on appeal, it was done on the basis of State Farm's correct statutory reliance on the Dunlaps' failure to exhaust. The issue of not paying the $1,000,000 UIM sooner or "blessing" the proposed settlement with DART was not premised on lack of cooperation or failure to timely provide complete medical records and keep them updated. It is that dispute between these parties, primarily prior to the Dunlaps' trial against DART, on which the expanded record now shines a new and revealing intense light.

Primarily the Dunlaps argue that State Farm is barred from raising the medical records issue as a "defense" to their claim of a breach of the covenant of good faith and fair dealing. They contend State Farm can only rely on a defense of failure to exhaust as used in prior correspondence. As authority for this proposition, they rely upon *Spine Care Delaware, LLC v. State Farm Mut. Auto Ins. Co.*[35] That case is inapposite.

Spine Care had treated a number of patients who had been injured in auto accidents, all State Farm insureds. It charged for two things, professional care and use of the facilities. State Farm paid the professional service bills but not the facilities use charge. Its denial was based solely on Spine Care's alleged lack of licensure to act as a free-standing facility. In the subsequent litigation, State Farm changed its denial reason to the defense that the use fee was not a reasonable or necessary medical expense. That new reason was provided long after the 30 days after it received the request to pay the use fee.

In that case, State Farm's obligation to pay arose under a statute regulating PIP insurer payments.[36] That statute requires

34. *Supra.*

35. 2007 WL 495899 (Del.Super.).

36. Title 21 § 2118B(c) states: When an insurer receives a written request for payment of a claim for benefits pursuant to § 2118(a)(2) of

that the insurer give to the claimant its reason for the denial within 30 days of the insurer's receipt of the payment request. This Court relied on that *statutory mandate* to hold that State Farm could not change its reason for the denial once the 30 days had passed.

The PIP statute at issue in *Spine Care* is not the relevant statute to this case. Another one is: 18 *Del. C.* § 3902. That is the exhaustion-of-primary-coverage statute upon which State Farm in this case relied. It is that reliance and invocation of that statute which has been held to mean that it did not act in bad faith. But key to this case at this point is that the statute contains no provisions for *when* payments of UIM coverage have to be made and has no requirement that a denial, if there is one, has to be accompanied (at any time) by a reason and be communicated within a specified time.

The decision in *Spine Care* was premised on a statute governing the duties of PIP carriers which contained clear obligations and timelines. This action is not premised on that statute; nor is it really premised on the statutory language governing UIM coverage. Instead, this action is based on an implied covenant in the insurance contract itself.

The Dunlaps also cite *Nathan Miller, Inc. v. Northern Insurance Co. of New York.*[37] for the proposition that State Farm is estopped from or has waived its ability to later inject reasons for denial other than exhaustion. That case is likewise inapposite. The Court in *Nathan Miller* found waiver where (1) even though there were specific time limits in the insurance contract for the insured to produce proof of loss, (2) the insurer's actions misled the insured into believing those time limits had been waived. The Court also found waiver where the insurer denied liability thus prompting the insured not to supply proof of loss within the time limit in the policy.[38] As in *Spine Care*, where the obligation on the insurer was an express statutory provision, the obligation of the insured to act was pursuant to express contractual provisions. It is far different to find waiver or estopped in those circumstances with express statutory or contractual mandates. Here, again, there are no equivalent or applicable statutory or contractual provisions. The covenant at work is implied. For that reason, this Court holds State Farm is not barred or estopped from defending this action, in these circumstances, on the basis of reasons other than exhaustion. The Dunlaps also cite an abbreviated bench ruling[39] as support for their argument. The Dunlaps' action now is not even denial of liability arising from a statutory or an express contractual obligation.

this title, the insurer shall promptly process the claim and shall, no later than 30 days following the insurer's receipt of said written request for first-party insurance benefits and documentation that the treatment or expense is compensable pursuant to § 2118(a) of this title, make payment of the amount of claimed benefits that are due to the claimant or, if said claim is wholly or partly denied, provide the claimant with a written explanation of the reasons for such denial. If an insurer fails to comply with the provisions of this subsection, then the amount of unpaid benefits due from the insurer to the claimant shall be increased at the monthly rate of: (1) One and one-half percent from the 31st day through the 60th day; and (2) Two percent from the 61st day through the 120th day; and (3) Two and one-half percent after the 121st day.

**37.** 39 A.2d 23 (Del.Super.1944).

**38.** *Id.* at 27.

**39.** *Thomas v. Hartford Mut. Ins. Co.*, Del.Super., C.A. No. 01C–01–046, Ridgley, J. (April 8, 2004). Too little of that bench ruling is provided and the transcript provided contains no factual background. For all intents and purposes, it is of no precedential value.

The waiver and estoppel found in *Spine Care* and *Nathan Miller*, on the other hand, were found where there were such express obligations. The $175,000 and other damages the Dunlaps seek is not for money covered by a provision in their contract with State Farm or in the UIM statute.[40] It is a potential obligation arising from the circumstances of how State Farm treated the Dunlaps' claim.

This conclusion necessarily means that there must be an examination of the full exchange of communication between the Dunlaps' counsel and State Farm's representatives (both its counsel and adjusters), internal State Farm communications (between adjusters and between State Farm counsel and its adjusters) and their thought processes. In short, the Dunlaps' amended complaint requires that the entire record of their dealings with State Farm be scrutinized to determine if a breach occurred. It cannot mean that only those communications involving exhaustion are relevant to this breach action. They are, but so are all the others. This is not a denial of or a breach of an explicit statutory obligation or express contractual provision. It is an action for an implied requirement in the parties' relationship. It is, therefore, relevant to the determination of whether State Farm breached the covenant to examine the entire record (written and verbal), not just the record as it relates to the issue of exhaustion.

■ There is an important element of mutuality in this covenant. In remanding this case to allow the Dunlaps to plead a breach of the covenant, the Supreme Court said, "The requirement that all parties to an insurance contract act in 'good faith' toward one another spans at least three centuries of American legal thought (footnote citation omitted)."[41] This mutuality means the actions and reactions of both parties must be examined. That, in turn, means there must be an examination not only of how State Farm was processing the UIM claim and the issues surrounding the proposed DART settlement but of how the Dunlaps, personally and/or through counsel, in turn, were dealing with State Farm. To phrase it another way, this case involves action and reaction.

In support of their motions, each side points to emails and letters the contents of which are not disputed. Each relies upon that circumstance to assert there are no genuine issues of material fact. From that foundation, each side then argues it is entitled to summary judgment as a matter of law. The Court concurs that content of the written communications is not contradicted. Of course, where these writings are file notes or the like, there could be important points omitted.

■ But what both sides overlook in their cross motions for summary judgment is the mutuality of the covenant, i.e., that it applies to both. And they overlook a key discussion in the Supreme Court's remand decision concerning some requirements in the covenant:

> Stated in its most general terms, the implied covenant requires "a party in a contractual relationship to refrain from arbitrary or unreasonable conduct which has the effect of preventing the other party to the contract from receiving the fruits" of the bargain. Thus, parties are liable for breaching the covenant when their conduct frustrates the "overarching purpose" of the contract by taking advantage of their position to control implementation of the agreement's terms. This Court has recognized "the

---

**40.** 18 *Del. C.* § 3902.

**41.** *Dunlap v. State Farm Fire and Cas. Co.,* 878 A.2d at 440.

occasional necessity" of implying contract terms to ensure the parties' "reasonable expectations" are fulfilled. This quasi-reformation, however, "should be [a] rare and fact intensive" exercise, governed solely by "issues of compelling fairness." Only when it is clear from the writing that the contracting parties "would have agreed to proscribe the act later complained of ... had they thought to negotiate with respect to that matter" may a party invoke the covenant's protections. (Footnotes omitted).[42]

That language focuses on what *are* the core genuine issues of material fact precluding an award of summary judgment to either side in this dispute. Those core issues revolve around the reasonable expectations of each side to this matter, possible conduct frustrating the "overarching purpose" of the insurance contract, and fairness. In a nutshell, the genuine issue of material fact to be resolved is the reasonableness of the conduct of each side, primarily, of course, State Farm's unilateral decisions and decisions in response to its interaction with the Dunlaps.[43] This prevents an award of summary judgment for either side.

## B

The Dunlaps resurrect their claim that State Farm acted in bad faith. While not doing so in express terms, they seek punitive damages, relying upon what they assert was State Farm's knowledge of Anne Dunlap's injuries, medical bills, and other expenses. Their effort relies upon cases holding it was bad faith to withhold payments the insurer was obligated to make. Some of what they assert is the factual basis for this resurrection are matters learned in the post-remand discovery. That includes State Farm's doubt that DART was liable, knowledge of Anne Dunlap's medical bills and physical condition, etc.

■■■ First, the Dunlaps forget the issue of bad faith was decided against them in connection with the exhaustion issue.[44] Second, they have not properly raised the right to renew a bad faith claim. Third, most of the record they use to seek to resurrect this claim was known to them before, especially the whole issue of Anne Dunlap's medical bills and their failure or refusal to supply complete medical records. Fourth, the record the Dunlaps use to attempt this back-door resurrection of their bad faith claim, by seeking punitive damages, does not rise to the level of bad faith. And finally, punitive damages are not recoverable in an action for breach of the covenant of good faith and fair dealing without bad faith.[45]

The Court will not entertain this claim or their request to "fine" State Farm. Nor, candidly does the Court see any effort to mislead this Court or the Supreme Court; an allegation that must be made with utmost care and an unequivocal record.

## II

■■ State Farm has moved to preclude Francis J. Jones, Jr., Esquire, from testifying at trial. While not DART's counsel at the trial involving the Dunlaps' claim against it, Mr. Jones was pre-trial counsel and was contacted by counsel for State

---

42. *Dunlap*, 878 A.2d at 442.

43. *Casson v. Nationwide Ins. Co.*, 455 A.2d 361, 368–69 (Del.Super.1982); *Thomas v. Harford Mut. Ins. Co.*, 2004 WL 1102362 (Del.Super.).

44. *Dunlap*, 878 A.2d at 440.

45. See *Miller v. Farmers Ins. Group*, 560 N.E.2d 1261 (Ind.App. 3 Dist.).

Farm. This was done in the context of State Farm's counsel reviewing the Dunlaps' request to "bless" the $175,000 possible settlement. While quoted earlier, resolution of this issue suggests the need to quote again pertinent portions of a letter State Farm's counsel sent to the adjuster, Niedzielski:

Following the start of this letter I called and spoke to both Pete Jones and Jim Drnec of the Morris James law firm. I spoke to Pete about the case for about 20 minutes and he told me that he turned over the file to Drnec. I discussed some of the strategic issues with Pete and then I discussed some of the factual issues with Jim.

Pete thinks that we're wrong in not permitting the plaintiff to accept part of the DART monies and to pursue the underinsured claim against State Farm. He's clearly not aware of any case law contrary to State Farm's position he just thinks that at "the end of the day" State Farm will end up paying its full policy limits to the insured. He said that our position may end costing the insured $175,000. Of course if DART is in fact a tortfeasor then the plaintiff's position may end up benefitting her by $300,00 more than she would have received had she not sued DART in the first place. Pete and I discussed this case back and forth for about 20 minutes and we simply agreed to disagree at the end. I asked him what position he would take a few years from now if State Farm did what Jim Woods wanted it to do now and a few years from now he had a similar fact pattern. If State Farm declined to do the same thing in the future would he remind State Farm of what it did in the Dunlap case and he said that he would. He said that the ultimate value of the case may be different in the future case. I told Pete that if State Farm changed its interpretation of its

own policy language from case to case depending upon the exposure to it that this would be bad faith. Relying upon strict interpretation of its own policy and what it believes to be Delaware law can hardly be bad faith.

He asked what position State Farm would take if Woods dismissed DART and he asked that as a rhetorical question. He quickly told me that State Farm would clearly take the position that DART was a tortfeasor and that it had to have exhausted the DART limits before it could pursue State Farm. While he asked and answered his own question that does raise a good point.

To this point the plaintiff is taking two conflicting points of view and trying to meld them into one consistent story. That is, she's taking the position that DART is a tortfeasor for the purposes of the lawsuit and the offer but she's also taking the position that DART is not a tortfeasor for the purposes of exhausting the policy limits of the tortfeasors. If the plaintiff had simply chosen not to sue DART in the first place it's unlikely that State Farm would have insisted that the DART limits be exhausted before the underinsured coverage could be approached. The question is whether there's anything that can be done to undo what has occurred up to this point or at least to put some responsibility upon the plaintiff to make a choice.

As I've said on prior occasions I don't know much about the plaintiff's injuries. I know that you think that they are significant and Pete Jones said much the same thing during our conversation. He made it clear to me that he believes that no matter how the suit against DART turns out that State Farm will be paying its policy limits. I don't know if State Farm shares that belief or whether its

even assessed the monetary value of plaintiff's injuries.

\* \* \* \* \* \*

Finally, as I said I did speak to Jim Drnec. He told me that the last offer was $175,000. I didn't ask if DART was anticipating offering more. When I spoke to Pete and he told me that they weren't going to defend against the damages but simply defend on the liability alone. From his point of view the plaintiff was either going to get zero or $300,000 from DART. Drnec did tell me that when he last discussed the case with Woods about two or three weeks ago there was some discussion of strategies but he didn't volunteer what the strategies were and I didn't discuss them.[46]

Jones' views are very probative concerning DART's liability, any reasoning for offering $175,000 and even any comment, if any (which the letter infers there could be) about why State Farm should allow the Dunlaps to get the $175,000 and not invoke exhaustion requirements.

The Court, of course, does not know the details of what he might say, but the Shalk letter does imply there are things he said that related to the overall obligation to act in conformity with the covenant. Unless something else develops, there is no reason to preclude Jones' testimony and every reason to get it, subject, of course, to any DART/counsel privilege.

State Farm, alternatively, seeks to get all of Jones (or the firm's files) if Jones is to testify. That asks too much. State Farm clearly wants memos, emails, letters, etc., between Jones, and/or his co-counsel, James Drnec and DART (or the carrier), which are privileged. Nothing has happened here which has removed the attorney-client privilege between Jones and his client. Nor has anything happened here to open up the door otherwise barring access to work product.[47] State Farm's motion to compel is denied.

### III

■ The Dunlaps move to preclude any trial testimony of Dr. Allan Fink. They assert several grounds for this motion: (1) Dr. Fink is a neurologist without qualification in handling insurance claims; (2) Dr. Fink cannot competently opine about any issue of (covenant breach) prejudice to State Farm;[48] (3) Dr. Fink used "reasonable medical certainty" not "reasonable medical probability"; and (4) he cannot properly comment on Dr. Crowley's report. Portions of the Dunlaps motion have merit, but the motion raises potential additional issues. There is one argued ground to preclude Dr. Fink's testimony, if proffered, that lacks merit. That ground is that preclusion is required because Dr. Fink uses the phrase "to a reasonable degree of medical certainty." Contrary to the Dunlaps' contention that this standard differs from "reasonable medical probability," the two phrases are interchangeable.[49]

46. Shalk letter to Niedzielski dated January 23, 2002. Defendant's motion, Exhibit E.

47. The Court notes, but is *not* inviting, that there is a possible issue of any memos Jones may have created which he was to refresh his testimony.

48. The Dunlaps, in making this argument, seem to focus on language in the remand decision about "prejudice" to State Farm.

*Dunlap*, 878 A.2d at 444. They argue the narrow issue remaining in the case is prejudice or its risk to State Farm. But the Dunlaps "focus" is too limited. As the Supreme Court also said, the issue is the reasonable expectations of both parties.

49. *Perkins v. State*, 920 A.2d 391, 395 (Del. 2007).

The Dunlaps are correct to argue that Dr. Fink lacks the qualifications to opine about how to handle an insurance claim. He is competent to opine about the meaning of the medical records supplied to State Farm. But he is without the expertise to opine how a reasonable insurance company would have processed the claim based on the records which were supplied. Keeping in mind that the jury will make the ultimate "reasonableness" determination, based on the partial records supplied, Dr. Fink could not properly testify (1) whether State Farm should have sought an IME at some point, (2) if so, when, and (3) once Shalk's letter made State Farm's adjuster aware of the Crowley letter, whether it should have insisted on a medical doctor's report, or fall back to an IME.

Perhaps there is no competent expert to opine on what State Farm should or should have done at the various stages of this matter. But respectfully to Dr. Fink, he is not that expert.

It is unclear at this point how or when State Farm would intend to use Dr. Fink. The Court is, therefore, reluctant to overstate or overly limit, at this stage, his potential testimony.

## IV

### State Farm's Motions to Disqualify Dunlaps' Counsel

#### A

State Farm has presented two motions to disqualify the Dunlaps' counsel, James Woods, Esquire, from further participation in this case.[50] One motion is premised on Woods' *ex parte* communication with the previously assigned judge. That communication prompted the judge to a *sua sponte* recusal. The content of the communication is not recorded nor is this judge aware of what Woods said. Suffice it to say, it was enough to cause the judge to take such action.

The *ex parte* communication was verbal at a scheduling conference on May 1, 2006, held after the remand. Whatever Woods' verbal, unrecorded comments were, no such comments have been made to me. Nor has he offered any on-the-record criticism of any action or comments by me such as he quotes in correspondence that the prior judge said.

Because that judge is recused, this judge sees no reason to re-engage in issues arising from that regrettable incident. Needless to say, it was not a proud moment for Woods.

#### B

What is more troubling, however, is the basis for State Farm's other motion to recuse Woods; invoking Delaware Lawyers' Rule of Professional Conduct 3.7. State Farm argues Woods is an important witness and should not be also the Dunlaps' counsel from now on. That Rule states:

Rule 3.7. Lawyer as witness.

(a) A lawyer shall not act as advocate at a trial in which the lawyer is likely to be necessary witness unless:

(1) the testimony relates to an uncontested issue;

(2) the testimony relates to the nature and value of legal services rendered in the case; or

(3) disqualification of the lawyer would work substantial hardship on the client

(b) A lawyer may act as advocate in a trial in which another lawyer in the lawyer's firm is likely to be called as

---

**50.** This judge denied both of these motions without prejudice on July 28, 2006, State Farm has renewed them and argued them at the proceeding on June 11, 2007.

a witness unless precluded from doing so by Rule 1.7 or Rule 1.9.

Fortunately, motions grounded on this Rule are rare and even more rarely granted. This case is one of even the rarer occasions when such motion has to be granted.

The reasons start from the essential issue the jury will have to decide: was State Farm's conduct reasonable (did it or did it not meet the reasonable expectations of the Dunlaps)? The Dunlaps' contact with State Farm was through Woods. The exhibits accompanying the parties' summary judgment motions contain letters to and from Woods. Since these letters could be offered as exhibits, alone they would not be a basis for disqualification. But the exhibits also show internal State Farm notes about telephone conversations with Woods. The content of some of these conversations may be disputed. That could or would be to the disadvantage of the Dunlaps.

But there are issues of State Farm's reasonableness in processing the claim which are responsive to how Woods himself was supplying or not supplying the medical records State Farm kept requesting. Woods has provided some answers to this issue when he was deposed. But he will have to talk about them in front of a jury, such as, explaining "his policy" not to supply them, how he perceived that choice advanced or harmed Anne Dunlap's UIM claim, why he pursued DART if its liability was allegedly so questionable, etc. These steps and his thought processes go to the core of what this case now is. Unlike the letters, there is no competent way to set them before a jury other than through his live testimony. And that is not fair to the Dunlaps and to State Farm, and above all to the jury. His thought processes, how his handling of the UIM claim being made to State Farm influenced its ability to adhere to the covenant of good faith and fair dealing are as important to State Farm's processing the claim as is, for instance, the apparent conscious decision of Mr. Dunlap to supply only summary information (withhold other information) to State Farm.

After all, State Farm was not acting or responding in a vacuum.

Since the presentation of much of Woods' relevant evidence cannot be duplicated at a trial, he cannot also serve as the Dunlaps' counsel. That fact, coupled with the variety of motions presented and the time needed to render this decision, necessarily means the September trial date is no longer viable. Nor does the Court reasonably see that a new trial date will be this year. In short, there is no substantial hardship to disqualifying Woods from being the Dunlaps' counsel under Rule 3.7. The Court finds that Rule prevents him from continuing as the Dunlaps' counsel.

### Conclusion

For the reasons stated herein:

1. Defendant State Farm's motion for summary judgment is **DENIED.**
2. Plaintiffs Dunlaps' cross-motion for summary judgment is **DENIED.**
3. Defendant State Farm's motion *in limine* in regard to Francis Jones is **DENIED.** State Farm's motion to compel Francis Jones' records is **DENIED.**
4. Plaintiff Dunlaps' motion to exclude testimony of Dr. Fink is **GRANTED,** subject to the limitations noted.
5. Defendant State Farm's motion to disqualify Dunlaps' counsel pursuant to 3.5 is **DENIED.**
6. Defendant State Farm's motion to disqualify Dunlaps' counsel pursuant to 3.7 is **GRANTED.**

**IT IS SO ORDERED.**